UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                          Criminal No. 11-369 (PAM/FLN)

                      Plaintiff,

               v.                                          **REPORT & RECOMMENDATION**

**01 - Steven Lavell Maxwell,**
**03 - Joel Delano Powell, Jr.,**
**04 - Desmon Desmond Burks**,
**05 - Norman Scott Allen,**
**09 - Frederick Adrianne Hamilton,**
**10 - Joel Delano Powell, III,**
**11 - Trey Jeremiah Powell,**
**12 - Elston Edwards Sharps,**

                  Defendants.
_____

Michelle E. Jones, Assistant United States Attorney, for Plaintiff.
Robert M. Christensen for Defendant Maxwell.
Defendant Joel Delano Powell, Jr, pro se; David Izek (standby counsel).
Michael McGlennen for Defendant Burks.
Leon A. Trawick for Defendant Allen.
Patrick W. Flanagan for Defendant Hamilton.
John C. Brink for Defendant Joel Delano Powell, III.
Steve L. Bergeson for Defendant Trey Jeremiah Powell.
Raymond A. Wood for Defendant Sharps.
_____

     **THIS MATTER** came before the undersigned United States Magistrate Judge on April 4 and

5, 2012 on Defendants' pretrial motions.  The matter was referred to the undersigned for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons set forth below,

the Court recommends that Defendants' motions be **DENIED**.

# I.   FINDINGS OF FACT

## A.      Brooklyn Park traffic stop

James Laszczak testified that he is a patrol officer with the Brooklyn Park Police Department. Tr. at 50, ECF No. 390.  On February 6, 2011, Laszczak initiated a traffic stop near the intersection of W. Broadway and Brooklyn Blvd. in Brooklyn Park.  *Id.* at 51.  Laszczak testified that he initiated the stop because he observed the vehicle change lanes without signaling and the vehicle's registration was obstructed by the bumper.[1]  *Id.*

Laszczak approached the vehicle and asked the driver for his license and proof of insurance. *Id.* at 53-54.  The driver, Defendant Trey Jeremiah Powell, gave Laszczak his driver's license but stated that he did not have proof of insurance because he had just purchased the vehicle.  *Id.* at 54.  Trey Powell produced a title certificate bearing another individual's name and was not listed on the certificate.  *Id.* at 54-55.  Laszczak returned to his squad car to check the status of Trey Powell's driver's license.  *Id.*

As Laszczak approached the vehicle for the second time, he smelled marijuana inside the vehicle.  *Id.*  He did not smell any marijuana during his first approach.  *Id.* at 78.  Upon smelling the marijuana, Laszczak ordered everyone to step out of the car, one at a time.  *Id.* at 55.  Laszczak conducted a pat frisk of each of the three individuals in the vehicle.  *Id.*  No weapons or other items were found on any of them.  *Id.* at 55-56.  The three individuals were then placed in two separate squad

---

[1]      Defendants contend that Laszczak could not have observed a lane-change violation because another car obstructed his view of the vehicle's turn signal.  The Court has reviewed the video from the squad car's dash-mounted camera and finds that it conclusively shows a lane-change violation: the driver of the vehicle entered the right-turn lane and turned right at the intersection without properly signaling.  *See* Def.'s Ex. B at 4:39:05-10.  The Court has also reviewed a photograph of the vehicle's license plate.  *See* Gov.'s Ex. 8.  It does not appear that the registration was obstructed.

cars. *Id.* at 55-59.  Laszczak testified that the three individuals were not free to leave because the squad-car doors were locked. *Id.* at 80.

After placing the individuals in the back of the squad cars, Laszczak returned to the vehicle to investigate the marijuana smell. *Id.* at 59.  Laszczak searched the back seat and found a black jacket that contained an open bag of marijuana and a gun along with some bank deposit slips. *Id.*  Laszczak immediately placed all three individuals–Trey Jeremiah Powell, Joel Delano Powell III, and their thirteen-year-old brother–under arrest. *Id.* at 59-60.

### B.      Wright County traffic stop

Melissa Lauer-Witt testified that she worked as a patrol deputy in the Wright County Sheriff's Office in August 2011.  Tr. at 27, ECF No. 392.  On August 31, an off-duty police officer called in to report that he had seen two black men enter a pawn and gun shop in Monticello with a "large wad of cash," which the off-duty officer estimated to be approximately $10,000. *Id.* at 29.  The off-duty officer further stated that the two men asked if they could purchase a gun without completing the necessary paperwork, but the store employee (who was also the owner) refused. *Id.* at 29-30.  The men then looked at the cameras in the store, touched a camera located near the front counter, and asked the owner which parts of the store were being recorded. *Id.* at 30-31, 36-37, 58-59.  As the two men left the store, the owner observed them tear up carbon copies of checks and throw them into a garbage can outside the pawn shop. *Id.* at 37.  The off-duty officer provided the dispatcher with a description of the suspects' vehicle, a blue Volkswagen Passat, along with the suspects' license-plate number. *Id.* at 30-31.

In response to the dispatch regarding the activity at the pawn shop, Lauer-Witt began searching the area for the suspects' vehicle in her squad car. *Id.* at 30.  Unable to locate the vehicle, Lauer-Witt

pulled over to the side of the road so that she could call the off-duty police officer. *Id.* While on the phone with the off-duty officer, Lauer-Witt observed the suspects' car drive past her. *Id.* at 31. She immediately pursued the car and initiated a traffic stop. *Id.* The off-duty officer's observations were the sole basis for the stop.

The traffic stop occurred at the on-ramp to I-94. *Id.* Lauer-Witt approached the driver's side of the vehicle and asked the driver for his license and registration. *Id.* at 32. The driver said his name was James Delano Dawson and that he did not have a driver's license. *Id.* The driver then started fidgeting with his right hand, which was near the center console. *Id.* at 33. Lauer-Witt immediately ordered him to step out of the vehicle, and her partner conducted a pat frisk. *Id.* at 33-34. No weapons or other items were found on Dawson, but brass knuckles were later found near the driver's seat. *Id.* at 33-34, 40.

Lauer-Witt then approached the passenger side of the vehicle to inquire as to whether the passenger possessed a driver's license. *Id.* at 34. While Lauer-Witt was standing near the front, passenger-side window, the passenger–Defendant Trey Jeremiah Powell–fidgeted with his left hand, which was near the center console and seat belt. *Id.* at 34-35. Lauer-Witt immediately ordered Trey Powell out of the vehicle, conducted a pat frisk, and found brass knuckles and a knife in his pants pocket. *Id.* at 34-35. Lauer-Witt asked him about the pawn shop, and he admitted he was there but denied attempting to purchase a gun illegally. *Id.* at 35-36. He claimed he was looking to purchase a GPS system and a digital camera. *Id.* at 35-36. Lauer-Witt then went back to her squad car to call the owner of the pawn shop to confirm what had happened. *Id.* at 36-37. She also ran the individuals' names through her computer. *Id.* at 37-38. Lauer-Witt's search revealed that Trey Powell had an outstanding arrest warrant for theft. *Id.* at 38. Dawson was not in the system, meaning no valid driver's

license had been issued to a person with that name.  *Id.*

      Lauer-Witt left the scene of the traffic stop to investigate the torn-up checks at the pawn shop. *Id.* at 36, 38.  Two or three other deputies remained, including Sergeant Roy Darsow.  *Id.* at 38-39. Lauer-Witt pieced together one of the checks and discovered that it had been written to Jonathan Sodo. *Id.* at 39.  Lauer-Witt knew Sodo and had recently seen him at a restaurant in town, so she went over to the restaurant to speak with him.  *Id.*  Sodo said he knew Trey Powell from school and that the two men offered him $50 if he cashed a $3,800 check for them.  *Id.* 39-40.  The three men went to a bank together, but the bank refused to make the funds available immediately.  *Id.* at 40.

      After Lauer-Witt spoke with Sodo, she received a call from an individual named Ramirez.  *Id.* at 43.  Ramirez had heard about her conversation with Sodo and called to tell her that he was also asked to deposit a check for the two suspects on that same day.  *Id.*  He told Lauer-Witt that he deposited a $3,200 check and successfully withdrew $3,000.  *Id.* at 44.  Ramirez said both suspects were present with him at the bank when he deposited the check.  *Id.* at 44-45.

      Lauer-Witt returned to the scene of the traffic stop.  *Id.* at 40.  Both Dawson and Trey Powell were placed under arrest.  Dawson was arrested for possession of brass knuckles and driving without a valid license.  *Id.* at 40-41.  Trey Powell was arrested for possession of brass knuckles and on account of his outstanding arrest warrant for theft.  *Id.* at 40-41.  Because no one was left to drive the vehicle, it was impounded and towed.  *Id.* at 42.  An inventory search was conducted, but Lauer-Witt was not present for that search.  *Id.*

      Lauer-Witt later learned that the driver of the vehicle was Defendant Joel Delano Powell III, after Trey Powell told a jailer that the driver was his brother.  *Id.* at 41.

      Roy Darsow also testified about the Wright County traffic stop.  Darsow is a patrol sergeant in the Wright County Sheriff's Office.  Tr. at 99, ECF No. 390.  Darsow conducted an inventory search

of the blue Volkswagen Passat driven by Defendants Joel Delano Powell III on August 31, 2011.  *Id.*

at 100-101, 104.  While searching the vehicle, Darsow found a backpack containing brass knuckles, a

folding knife, a dollar bill, a GPS device, a digital camera, some t-shirts, and a pair of gloves.  *Id.* at

107-08.  Darsow also found a loaded revolver in the trunk.  *Id.*

### C.       Search warrants for Defendant Maxwell's home and vehicles

On October 12, 2011, U.S. Postal Inspector Barry Bouchie applied for three search warrants:

one for Defendant Maxwell's home and two for his vehicles.  *See* Gov's. Ex. 1(a), 2(a), and 3(a).  The

three affidavits are identical and describe the following information: four different people allege that

Defendant Maxwell is the leader of a conspiracy to steal the personal information of a large number of

individuals, determine which of these individuals had good credit reputations, and then develop enough

additional information about the individuals to take over their identifies and issue counterfeit checks

or procure other financial instruments in their names or by using their accounts.  Gov.'s Ex. 1(a) at 3.

Law enforcement obtained the information contained in the affidavit from three cooperating

witnesses and one confidential informant.  *Id.* at 5, 7, 10, 13.  The three cooperating witnesses were

check-cashers in the conspiracy.  *Id.* at 5, 7, 10.  Each check-casher provided a similar sketch of the

conspiracy.  Defendant Maxwell (or other co-conspirators) would pick up the check-casher in a vehicle

and bring them to a store such as Wal-Mart or Walgreen's.  *Id.* at 5-6, 9-11.  Maxwell provided the

check-cashers with a fraudulent identification (made using a photograph of the check-casher)  along

with some stolen or counterfeit checks.  *Id.* at 5-6, 9-11. The check-cashers were instructed to buy

merchandise using the check and then later return the merchandise for cash.  *Id.* at 6, 9-11.  The check-

cashers said Maxwell kept excellent records of every check he issued along with receipts of every

fraudulent purchase the check-cashers made.  *Id.* at 7, 10.  If Maxwell did not accompany a check-

casher on a trip, he required the casher to wire the proceeds back to him.  *Id.* at 7.  The check-cashers

said that Maxwell kept a large number of receipts in his vehicle along with a briefcase that contained various documents related to the fraud.  *Id.* at 7.  Two check-cashers estimated that they were each responsible for losses of $250,000.  *Id.* at 6, 10.  A third check-casher, who cashed checks for approximately six months, estimated that she "made between $6,000 and $10,000 per week." *Id.* at 11.

The confidential informant told law enforcement that Maxwell used a website called publicdata.com to do research on individuals whose identities he sought to steal.  *Id.* at 15.  Maxwell would use his home computer to conduct this research.  *Id.*  Other computer research was done at FedEx/Kinko's stores.  *Id.*   Law enforcement confirmed with publicdata.com that Maxwell has a subscription to the site.  *Id.*  The site's records indicated that an IP address associated with a computer in Maxwell's residence had conducted at least nine separate searches on the website.  *Id.* at 16, 17.

The search warrants were executed on October 13, 2011.  The police seized various items relevant to the offenses charged in the indictment including identification cards, bank documents, cell phones, an external hard drive, and a computer.

## II.   CONCLUSIONS OF LAW

### A.      Brooklyn Park traffic stop

Defendants Trey Powell and Joel Delano Powell III contend that any evidence seized as a result of the Brooklyn Park traffic stop must be suppressed because the stop and search of the car violated the Fourth Amendment.

The vehicle's lane-change violation provided Laszczak with probable cause to initiate the traffic stop.  *See United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008).  Laszczak then had the authority to check the driver's license and registration.  *Id.*  When Laszczak returned to the vehicle and smelled marijuana, he had probable cause to search the entire vehicle.  *See United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (stating that officer's "smell of burnt marijuana . . . gave him probable cause

to search the entire vehicle for drugs"); *United States v. Hernandez-Mendoza*, 600 F.3d 971, 976 (8th Cir. 2010), *amended by* 611 F.3d 418 (8th Cir. 2010) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").  Because Laszczak had probable cause to search the entire vehicle, the Court concludes that no Fourth Amendment violation occurred.[2]  The evidence need not be suppressed.

### B.    Wright County searches

Defendants Trey Powell and Joel Delano Powell III challenge two searches of their vehicle.  The first search was an inventory search conducted after a Wright County traffic stop.  The second search was conducted a day later and pursuant to a search warrant.  Defendants contend that any evidence seized during the traffic stop must be suppressed because the stop and search of the vehicle violated the Fourth Amendment.  Defendants further contend that any evidence seized during the second search must be suppressed because the warrant is the fruit of the illegal stop.

### 1.    The traffic stop

A law enforcement officer may conduct a brief, investigatory stop of a vehicle only if she has a reasonable suspicion that criminal activity is afoot.  *United States v. Walker*, 555 F.3d 716, 720 (8th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  "In order for such a stop to be constitutional under the Fourth Amendment, the officer must be aware of particularized, objective facts, which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  *Id.* (internal quotation marks omitted).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is

---

[2]    Consequently, the Court need not address Defendants' argument that "Laszczak used a pretext to impound the car to justify a search."  Def's Mem. at 4, ECF No. 380.

determined in light of the totality of the circumstances." *United States v. Johnson*, 601 F.3d 869, 872

(8th Cir. 2010). "Reasonable suspicion does not exist solely on the basis of an officer's hunch." *United*

*States v. Dunning*, 666 F.3d 1158, 1164 (8th Cir. 2012) (citing *Terry*, 392 U.S. at 30).

Lauer-Witt had nothing more than a mere hunch that the men might, at some point in the future,

commit a robbery. Although the two men asked about the possibility of illegally purchasing a gun, the

store-owner refused. Thereafter, the men asked questions about the store surveillance system, including

which parts of the store were being recorded. The men left the store, drove away, and were headed to

the freeway when Lauer-Witt stopped their car. At least five minutes had passed since they had left the

pawn shop. Because these facts do not amount to a reasonable, articulable suspicion to justify a traffic

stop, and no traffic violations were otherwise observed, Lauer-Witt violated the Fourth Amendment

when she stopped the car.

Although the Court concludes that the stop was illegal, the evidence seized as a result of that

stop may still be admitted if the second search falls within an exception to the exclusionary rule. *See*

*Murray, v. United States*, 487 U.S. 553, 542 (1978).

**2.      The second search**

Defendants Trey Powell and Joel Delano Powell III contend that any evidence seized from the

vehicle pursuant to the search warrant executed on the following day must be suppressed because the

supporting affidavit depends "upon the information gleaned from the illegal search of the car . . . ."

Def.'s Mem. at 6, ECF No. 380; Def.'s Mem at 5, ECF No 364. The exclusionary rule, however, does

not apply when police discover evidence through an independent source. *See United States v. Craig*,

630 F.3d 717, 721 (8th Cir. 2011). In order for a warrant obtained after an illegal search to be an

independent source, the Court must answer two questions in the affirmative: (1) "would the police have

applied for the warrant had they not acquired the tainted information"? and (2) "do the application

9

affidavits support probable cause after the tainted information has been redacted from them"? *Id.* (interpreting *Murray v. United States*, 487 U.S. 533 (1978)).

As to the first question, the Court concludes that the police would have applied for the warrant even if they had not acquired the tainted information. Because none of that information (ie. the gun and the brass knuckles) had anything to do with bank fraud, it is likely that the police would have applied for the warrant even without the tainted information.

As to the second question, the affidavit in support of the search warrant recites the following facts, none of which are tainted. An off-duty police officer observed two men discard carbon-copy checks after leaving the pawn shop. Gov.'s Ex. 6 at 3. He also wrote down the license plate number for their vehicle. *Id.* A sheriff's deputy reassembled the checks and spoke with two of the individuals to whom checks had been written. *Id.* Both individuals identified the Powells as the men who wrote the checks and said that the Powells offered them money to cash the checks. *Id.* After contacting the issuing bank, law enforcement learned the checking account had been closed for over a year. *Id.* Trey Powell was taken into custody in part because he had an outstanding arrest warrant for theft. *Id.* While in custody, Trey Powell told a visitor in a recorded conversation that the police "will not be able to find the rest of the money in the car."[3] *Id.* The Court concludes that these facts are untainted and, when taken together, demonstrate probable cause to believe that evidence of bank fraud would be found in the car.

Because the car was searched pursuant to the search warrant and the information contained in the supporting affidavit stems from an independent source, the evidence seized from the car need not be

---

[3]   The recorded conversation is not tainted because Trey Powell's arrest pursuant to the outstanding arrest warrant is an intervening circumstance that purges the taint of the illegal traffic stop. *See United States v. Faulkner*, 636 F.3d 1009, 1016 (8th Cir. 2011) (Defendant's "outstanding arrest warrant constitute[d] an extraordinary circumstance that purge[d] much of the taint associated with the officers' unconstitutional conduct.") (alteration in original) (quoting *United States v. Simpson,* 439 F.3d 490, 496 (8th Cir. 2006).

suppressed.[4]

## C. Search warrants as to Defendant Maxwell's home and vehicles

Defendant Maxwell moves to suppress any evidence seized pursuant to three search warrants, one as to his residence and two as to his vehicles, because he contends that the supporting affidavits lacked a sufficient showing of probable cause.

A valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* Whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). "When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations-but not independent, essential elements-in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.1986). In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together. *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

The Court has reviewed the affidavits supporting the search warrants and finds that each recites

---

[4]     The Court notes that some items were illegally seized (during the inventory search) and then legally reseized (pursuant to the search warrant). *See* Gov.'s Ex. 6 at 9-10. The evidence from the first search that was reseized during the second search is admissible. *See Murray,* 487 U.S. at 542 ("It seems to us, however, that reseizure of tangible evidence already seized is no more impossible than rediscovery of tangible evidence already discovered. The independent source doctrine does not rest upon such metaphysical analysis . . . .").

facts that, when taken together, establish more than a "fair probability" that evidence related to bank fraud would be found in Maxwell's home and vehicles. There were four different individuals who provided information to law enforcement: three check-cashers and a confidential informant who served as an intermediary between Defendant Maxwell and the check-cashers. The description of the conspiracy provided by each individual was roughly the same. Maxwell searched public databases, sometimes using his home computer, to find individuals with good credit reputations. He then procured fraudulent identification documents in those individuals' names along with fraudulent or stolen checks.

The four individuals told law enforcement that Defendant Maxwell would pick the check-cashers up in his vehicle and provide them with fraudulent identification and checks while they drove to various retail businesses. Defendant Maxwell gave the check-casher instructions to purchase goods from the stores using the fraudulent identification and checks. Maxwell then brought the check-casher back to the business to return the fraudulently-obtained merchandise for cash. At least one of the check-cashers said that Maxwell kept meticulous records, many of which were stored in a briefcase in his vehicle.

The Court concludes, given the totality of the circumstances described in the affidavits, that probable cause existed to support the issuance of the search warrants as to Defendant Maxwell's home and vehicles. The evidence seized pursuant to those warrants is admissible.

### D. Duplicity

Defendants Maxwell, Joel Powell Sr., Joel Powell, Jr. Burks, Allen, Hamilton, and Trey Powell all contend that count 1 of the indictment is duplicitous and must be dismissed. Count 1 charges Defendants with "execut[ing] and attempt[ing] to execute a scheme or artifice to defraud businesses and the Financial Institutions . . . in violation of" 18 U.S.C. § 1344. Superseding Indictment at 7, ECF No. 39. 18 U.S.C. § 1344 makes it a crime to "execute, or attempt[] to execute, a scheme or artifice to

defraud a financial institution" but not businesses.[5]

Duplicity is the joining of two or more distinct and separate offenses in a single count. *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995). "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir. 1994).

The Court reads the "and" between "businesses and the Financial Institutions" as conjunctive, not disjunctive, meaning count 1 requires proof of both facts–one of which is an offense while the other is not (or at least not an offense charged in the indictment). Consequently, there is no risk that a jury might convict Defendants without unanimous agreement as to the offense charged. Alternatively, even assuming for the sake of argument that the count was duplicitous, any potential prejudice to Defendants can be cured with a limiting instruction. *See United States v. Yielding*, 657 F.3d 608, 703 (8th Cir. 2011) ("Assuming for the sake of argument that count one of the indictment was duplicitous, the district court's limiting instruction cured any potential prejudice to [the defendant].").

The Court concludes that count 1 is not duplicitous and need not be dismissed.

## III.   RECOMMENDATION

### A.  Defendant Maxwell's Motions (01)

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY RECOMMENDED** that:

1.  Defendant's motion to suppress evidence in violation of the Fourth Amendment [#224] be **DENIED**.

2.  Defendant's motion to dismiss count 1 of the indictment on the grounds of duplicity [#338] be **DENIED**.

---

[5]   To the extent Defendant Hamilton challenges the use of the word "attempt" in count 1, the statute makes clear that it is a crime to attempt to defraud a financial institution.

**B.  Defendant Joel Delano Powell Jr.'s Motions (03)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that :

    1.    Defendant's motion to motion to dismiss count 1 of the indictment on the grounds of duplicity [#394] be **DENIED**.

    2.    Defendant's motion seeking relief from government's defects of institution of prosecution [#388] be **DENIED**.  Defendant Powell objects to the Court's twice continuing the pretrial motions hearing.  *See* Def.'s Mot. at 1-4, ECF No. 388; *see also* ECF No. 231 & 320.  Defendant did not object, either pro se or through counsel, before the Court granted each continuance.  *See* ECF Nos. 231 & 298.

**C.  Defendant Burk's Motions (04)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that:

    1.    Defendant's motion to dismiss for duplicity [#332] be **DENIED**.

    2.    Defendant's motion to dismiss for double jeopardy [#333] be **DENIED**.  The dual sovereignty doctrine allows the federal and state governments to bring successive prosecutions for offenses arising from the same criminal act.  *See United States v. Larsen*, 427 F.3d 1091, 1094 (8th Cir. 2005).  The *Petite* policy does not confer any substantive rights on a criminal defendant.  *Id.*

**D.  Defendant Allen's Motion (05)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that Defendant's motion to dismiss count 1 as duplicitous, filed via a letter to the

Court, [#365] be **DENIED**.

**E.  Defendant Hamilton's Motion (09)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that Defendant's motion to dismiss count 1 as duplicitous [#367] be **DENIED**.

**F.  Defendant Joel Delano Powell III's Motions (10)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that:

1. Defendant's motion to suppress search and seizure evidence [#202] be **DENIED**.

2. Defendant's motions to suppress identification evidence, [#203] and [#334], be **DENIED**. The Government represented at the hearing that it does not intend to use any identifications other than those concerning which it presented evidence. Defendant Powell did not submit post-hearing briefing on either motion and therefore appears to have abandoned the motions.

3. Defendant's motion to dismiss count 1 on the grounds of duplicity [#363] be **DENIED**.

**G. Defendant Trey Jeremiah Powell's Motion (11)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that Defendant's motion to suppress evidence obtained from search and seizure

[#254] be **DENIED**.

**H. Defendant Sharp's Motions (12)**

Based upon the foregoing, and all the files, records, and proceedings herein, it is **HEREBY**

**RECOMMENDED** that:

1. Defendant's motion to dismiss count 1 on the grounds of duplicity [#382] be **DENIED**.

2. Defendant's motion for leave to file motion to dismiss count 1 [#381] be **DENIED** as moot.

DATED: May 10, 2012                                          s/ *Franklin L. Noel*

                                                                          FRANKLIN L. NOEL
                                                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 24, 2012**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days

after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 24, 2012,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.